# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

JAMMIE E. LOECKLE,

        Plaintiff,

vs.

ANDREW SAUL, Commissioner of
Social Security,

        Defendant.

No.  19-CV-3031-LTS-KEM

**REPORT AND
RECOMMENDATION**

_____

Plaintiff Jammie E. Loeckle seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Loeckle argues that the administrative law judge (ALJ), Julie K. Bruntz, erred by discounting the treating-source medical opinions; failing to include a residual functional capacity (RFC) limitation reflecting Loeckle's moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace; and failing to include some of the RFC limitations found by the state agency psychological consultants.  Loeckle also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018).  I recommend **affirming** the ALJ's decision.

## I.    BACKGROUND

Loeckle, born in 1978, has suffered back pain since he was a child, the result of an inherited bone disease.  AR 36-37.[1]  With the use of prescription pain medication, he

---

[1] "AR" refers to the administrative record below, filed at Docs. 7-2 to 7-8.

was able to work full time on an assembly line for a mattress manufacturer from 2008 to March 2010 and as a shower installer for motor homes from March 2010 to January 2011. AR 283. He stopped working in January 2011 to undergo back surgery, an L5-S1 discectomy (disc removal), performed by neurosurgeon David Beck, MD. AR 398, 400. A few months later, Loeckle continued to suffer back pain and developed right leg pain, so Dr. Beck ordered a magnetic resonance imaging (MRI) and determined in April 2011 that Loeckle needed additional surgery. AR 402-04. That same day, Loeckle filed prior applications for DI and SSI benefits (which were denied a month later on initial review and not appealed further). AR 78. Loeckle's insurance company initially denied coverage for a second surgery, and it appears that Loeckle returned to work for a brief period with lifting restrictions. *See* AR 406-08, 712. When Loeckle's pain continued, Dr. Beck obtained insurance approval for a second back surgery and performed a laminectomy and lumbar fusion at L5-S1 on July 12, 2011. AR 657, 659. Dr. Beck released Loeckle to return to work with weight-lifting restrictions in mid-September 2011. AR 415. Loeckle continued to be in pain, but he had already taken too much time off work for his prior surgeries, so he delayed a third surgery until the end of March 2012. AR 423, 660-61, 712. On March 29, 2012, Dr. Beck operated for the third time on Loeckle's back, performing a L4-S1 laminectomy, medial facetectomy, and nerve root decompression to improve the radicular nerve pain in Loeckle's right leg. AR 660-61.

After recovering from surgery, Loeckle began working full time for his father's company in the fall of 2012, but by March 2013, he reported being out of work (he also reported receiving an Operating While Intoxicated charge in February 2013, which caused him to stop drinking heavily most nights and to become sober). AR 283, 499-500, 645. Loeckle started working full time for a construction company, pouring concrete, as well as working part time at a local gas station on his days off from the construction job. AR 283, 613, 629, 632-33, 641, 645.

2

In November 2013, Loeckle met for the first time with Andrew Stowell, PA (PA Stowell), for mental-health treatment. AR 644-46. Loeckle reported taking Valium (diazepam) for the past three years to treat back spasms but noted it also improved his anxiety. *Id.* PA Stowell prescribed Loeckle two antidepressants (not Valium), and Loeckle obtained a Valium prescription from a provider at Dr. Beck's office. *Id.*; AR 504, 641. Loeckle continued to see PA Stowell regularly from November 2013 through the summer of 2014, trying different medications for his mental-health issues, including anxiety, irritability, anger, and trouble sleeping. AR 592-647. Loeckle also continued to work two jobs, at the construction company and the gas station.

In August 2014, Loeckle began working full time at a Pepsi soda bottling factory. He worked Monday through Friday from 11 a.m. to 7 p.m. at Pepsi and continued to work Saturday and Sunday at the gas station (he no longer worked construction). AR 283, 487, 589, 592. Due to his new work schedule, he could no longer make appointments with PA Stowell, so he began seeking mental-health treatment from a psychiatrist in PA Stowell's office, Mark Lassise, MD. AR 589, 592.

From August 2014 to early April 2016, Loeckle worked full time at Pepsi weekdays and worked at the gas station on the weekends. AR 283. During this time, he continued to complain of back pain and right leg pain; sought a referral to the Mayo Clinic (which the Mayo Clinic denied); and received epidural steroid injections, a facet nerve block, and a nerve pain stimulator. AR 424-26, 438-45, 486-88, 505. He also saw Dr. Lassise about once a month, trying different medications to help improve his mental-health symptoms. AR 517-589. On March 3, 2016, Loeckle phoned Dr. Lassise's office, asking if Dr. Lassise could help him obtain disability benefits. AR 517. A few days later, Loeckle had an appointment with Dr. Beck, in which Dr. Beck noted he "encouraged [Loeckle] to apply for disability" and indicated he thought it "perfectly reasonable that [Loeckle] get it." AR 490. Loeckle put in his two weeks' notice with Pepsi, and his last day working there was April 6, 2016. AR 61, 283. On April 8, 2016,

3

Loeckle filed the current applications for DI and SSI benefits, alleging a disability onset date of April 6. AR 77-78. During the summer of 2016, Loeckle continued working part time at the gas station, and he later amended his onset date to October 1, 2016, because his gas-station earnings rose above the substantial gainful activity level. AR 277, 283.

Loeckle's DI and SSI applications were denied on initial review in June 2016. AR 77-104. On July 20, 2016, Loeckle reported to Dr. Beck that he had developed left leg pain since his last appointment in March 2016. AR 490, 682. Dr. Beck ordered an MRI and recommended Loeckle undergo a fourth back surgery. AR 652-53, 669, 682. On September 13, 2016, Dr. Beck performed an L5 decompression and extended Loeckle's previous laminectomy and fusion. AR 673, 684-89. Dr. Beck also removed the spinal stimulator that had been placed in Loeckle's back in January 2016, since it did not improve his pain. *Id.* After Loeckle recovered from surgery, he returned to working two to three days a week at the gas station, usually seven-and-a-half-hour shifts. AR 65, 273-74, 283. In December 2016, the Social Security Administration denied Loeckle's DI and SSI applications on reconsideration. AR 109-144. In connection with both the initial review and determination on reconsideration, state agency psychological and medical consultants evaluated Loeckle's mental and physical limitations. AR 83-87, 118-23.

Loeckle requested review before an ALJ, and the ALJ held an administrative hearing by video on July 10, 2018, at which Loeckle and a vocational expert (VE) testified. AR 10, 31-32. On September 7, 2018, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[2] to determine Loeckle

---

[2] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R.**

(Footnote continued . . .

4

was not disabled from October 1, 2016, through the date of the decision. AR 10-24. At step one, the ALJ found that Loeckle's earnings from working part time at the gas station did not rise to the level of substantial gainful activity during the relevant time period. AR 12. At step two, the ALJ determined Loeckle suffered from the following severe impairments: bipolar affective disorder, degenerative disc disease, spinal stenosis, status post-three-back surgeries,[3] and obesity. AR 13. As part of the ALJ's step-three finding that Loeckle's impairments did not meet or equal a listing, the ALJ found Loeckle suffered moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. AR 14-15. The ALJ determined that despite his impairments, Loeckle retained the following RFC[4]:

> [Loeckle] has the [RFC] to perform sedentary work . . . except his ability to push or pull would be unlimited within the weights specified by the regulation [defining sedentary work]. He could occasionally climb ramps and stairs but never ladders, ramps, or scaffolds. [Loeckle] could occasionally balance, stoop, kneel, crouch and crawl. He would need to avoid concentrated exposure to extreme cold and hazards such as heights and dangerous machinery. He would [be] limited to a job that could be learned in 30 days or less and could have occasional contact with the public, co-workers, and supervisors.

AR 16; *see* **20 C.F.R. §§ 404.1567(a), 416.967(a)**. Based on his RFC, the ALJ found at step four that Loeckle could not return to his past work but concluded at step five that a significant number of jobs existed in the national economy that someone with Loeckle's

---

**§§ 404.1520(a)(4), 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005) (quoting **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004)).

[3] The ALJ appeared to miss Loeckle's July 2011 back surgery. *See* AR 19.

[4] RFC means "the most that a claimant can do despite her limitations." **Sloan v. Saul**, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**).

5

age, education, work experience, and RFC could perform, including document preparer, weight tester, and addresser.  AR 22-23.

Loeckle appealed.  The Appeals Council denied Loeckle's request for review on May 6, 2019 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.  *See* **20 C.F.R. §§ 404.981, 416.1481**.  Loeckle filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Doc. 1).  *See* **20 C.F.R. § 422.210(c)**.  The parties briefed the issues (Docs. 11-14), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707.  The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).  If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Loeckle challenges the weight the ALJ assigned to Dr. Beck's and Dr. Lassise's treating-source opinions.  Loeckle also argues that the ALJ erred in determining his RFC because the ALJ failed to include mental limitations supported by the ALJ's step-three findings and the opinions of the state agency psychological consultants.  Finally, Loeckle argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

6

## A. Weight to Medical Opinions

Loeckle challenges the ALJ's evaluation of medical opinions from his treating providers:  Dr. Beck, the neurosurgeon who performed Loeckle's back surgeries and prescribed his pain medications, and Dr. Lassise, the psychiatrist who prescribed Loeckle's mental-health medications.  When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence."  **20 C.F.R. §§ 404.1527(b), 416.927(b)**.  "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**.  "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so."  *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).  The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**).

### 1. Dr. Beck's Opinions

Dr. Beck submitted several letters to the Social Security Administration addressing Loeckle's limitations.  In May 2011, in connection with Loeckle's prior disability applications, Dr. Beck opined that Loeckle could not "lift more than 20 pounds with any

frequency" and could not "sit, stand, or walk comfortably." AR 408. The ALJ assigned this opinion little weight "as it [wa]s from seven years ago and [Dr. Beck] has given subsequent opinions." AR 19. In April 2016, Dr. Beck opined that because of his pain, Loeckle could not "lift or carry more than 10 pounds"; stoop, kneel, crawl, or bend; or "stand, walk or sit more than 10 minutes at a time comfortably." AR 485. Dr. Beck submitted a similar opinion in August 2016, except he found Loeckle could not lift or carry more than twenty pounds and that he could not stand, sit, or walk for more than thirty minutes at a time. AR 667. The ALJ assigned both of these opinions little weight, since Loeckle underwent back surgery in September 2016 (after the issuance of these opinions) and Dr. Beck submitted more recent statements. AR 19. Dr. Beck submitted additional letters in October and November 2016 in which he noted that Loeckle was still recovering from surgery and could not work "at the present time." AR 681, 698. The ALJ assigned these opinions little weight as they opined as to limitations before Loeckle had fully recovered from surgery. AR 19.

Finally, Dr. Beck completed a form from Loeckle's attorney in January 2017. AR 712-14. He answered "yes" in response to questions asking whether it was "still true" that Loeckle could not sit or be on his feet for more than ten minutes at a time each (as he had opined in his November 2016 letter). AR 713. He answered "yes" in response to questions indicating Loeckle could sit for no more than four hours total and stand or walk for no more than two to three hours total in a workday. AR 713. Dr. Beck agreed that Loeckle needed to shift positions every ten minutes. AR 713. Further, Dr. Beck agreed that Loeckle could not stoop, kneel, crawl, or bend; that he could not lift or carry more than ten pounds; that he would need frequent unscheduled breaks and would miss work more than three times a month; and that he would work at a slow pace more than 20% of the time. AR 713-14. The ALJ assigned this opinion "partial weight," noting the months-long gap between Dr. Beck's January 2017 opinion and when he last saw Loeckle in October 2016. AR 19-20. The ALJ also relied on the "large gap in the

treatment record" since Loeckle had not received "any health care since January 2017." *Id.* The ALJ also noted that Dr. Beck's opinion was inconsistent with the opinions of the state agency medical consultants and Loeckle's ability to work part time at the gas station after recovering from surgery. *Id.*

The last treatment note in the record from Dr. Beck (or any provider) is from October 2016. AR 708; Doc. 11 at 7. Loeckle suggests that the ALJ erred in relying on Dr. Beck's lack of treatment since October 2016, because Loeckle testified that he continues to "go to [Dr. Beck's] office every two weeks . . . just to pick up [his] scripts." AR 63. Loeckle's testimony, however, does not support that he actually sees Dr. Beck, explains how he is feeling, or undergoes any sort of examination. Indeed, in February 2018, Loeckle confirmed that his "last visit" with Dr. Beck had been in October 2016. AR 387. The ALJ could rely on Dr. Beck's lack of recent treatment of Loeckle in declining to fully credit his January 2017 RFC opinion, since the last time Dr. Beck had seen Loeckle, Loeckle had not fully recovered from a recent back surgery a little more than a month prior, and Dr. Beck found Loeckle just as limited in January 2017 as he had in November 2016, when he acknowledged Loeckle had not yet fully recovered. *See* AR 681, 698, 713-14; *see also* AR 667 (Dr. Beck noted that Loeckle would not be able to work for at least 2 to 3 months following back surgery). I further note that the basis for most of Dr. Beck's opined limitations was "pain," and while Dr. Beck's treatment notes reflect Loeckle frequently complained of severe back pain, most of Dr. Beck's treatment notes are from a time in which Loeckle was able to work a full-time job in addition to a part-time job, despite his pain complaints. *See* AR 424-26, 486-90, 505-08; *see also* AR 669, 682 (treatment notes when working part time at substantial gainful activity level).

Loeckle also argues that the gap in treatment noted by the ALJ was not as large as found by the ALJ. The October 2016 treatment note from Dr. Beck is the last treatment note in the record. Doc. 11 at 7. Loeckle notes, however, that he reported visiting Dr.

Lassise in the fall of 2017 and in March 2018; visiting a "Dr. Timpe" in December 2017, who prescribed migraine medication; and visiting "Dr. Timothy Dettmer" in January 2018, who performed deviated septum surgery. AR 387-88, 392-93. Loeckle's visits to these providers after October 2016 do not appear related to pain treatment: the appointments with Dr. Lassise related to his mental health; the appointment with Dr. Timpe appears related to migraines (which the ALJ found to be a nonsevere impairment at step two, based in part on Loeckle's failure to "discuss headaches while testifying" (AR 13)); and the appointment with Dr. Dettmer appears related to nose surgery. To the extent that Loeckle suggests the ALJ failed to recognize that he continued to receive prescription medications from Dr. Beck and Dr. Lassise, I disagree. The ALJ acknowledged that Loeckle "takes prescription medications" and relied on Loeckle's lack of continued appointments, not Loeckle's lack of medications. AR 20.

The ALJ also relied on Loeckle's ability to work part time. Loeckle argues that his ability to work part time at the gas station is not inconsistent with Dr. Beck's January 2017 opinion because of the accommodations he receives at work. Loeckle's testimony and a statement from his manager support that he is allowed to sit on a stool behind the cash register, shifting positions between sitting and standing, and that he never has to lift more than ten pounds at work—his manager does not schedule him on days that truck deliveries will require stocking shelves, and he is not required to take out the garbage or change the carbon dioxide in the soda machines, unlike others in the same position. AR 43, 47-51, 362-63. Loeckle testified, however, that sometimes his job requires him to stand for up to thirty minutes without sitting. AR 43. Although he testified that standing for this length of time causes increased pain, he is able to do it—which is inconsistent with Dr. Beck's finding that he could only stand for ten minutes at a time. Furthermore, although Loeckle's manager indicated that he needed to take unscheduled breaks when he previously stocked shelves, her statement does not reflect that he requires unscheduled breaks with his current duties. AR 362-63. In addition, Dr. Beck's opinion suggests

10

that Loeckle could only be on his feet and sit for a total of six to seven hours in an eight-hour day, but Loeckle consistently worked seven-and-a-half-hour shifts where he was either on his feet or sitting (plus had to sit or walk an additional length of time to travel to work). The ALJ could find Loeckle's part-time employment inconsistent with some of Dr. Beck's opined limitations.

Loeckle argues that an ALJ cannot discount a treating-source opinion because it is inconsistent with the opinion of a state agency consultant. Although true, the ALJ here did not discount Dr. Beck's opinion solely because it was inconsistent with a state agency consultant's opinion (as discussed above). Instead, by noting that Dr. Beck imposed more limitations than those of the nonexamining state agency medical consultants, the ALJ highlighted the fact that the ALJ formulated an RFC more limiting than the opinions of the state agency medical consultants but less limiting than Dr. Beck's opinion and that some medical evidence supported the ALJ's RFC determination. *See* AR 20.

Overall, almost all of Dr. Beck's treatment of Loeckle occurred prior to his alleged onset date, at a time when Loeckle was able to work seven days a week despite his complaints of severe pain. The evidence does not establish that Loeckle's pain has worsened so significantly that he suffers the extreme limitations found by Dr. Beck. I recommend finding that substantial evidence supports the ALJ's failure to fully credit Dr. Beck's RFC opinions.

### 2. Dr. Lassise's Medical Opinion

Dr. Lassise completed a form provided by Loeckle's attorney in January 2017. AR 715-17. Dr. Lassise indicated that Loeckle suffered marked limitations in accepting criticism from coworkers and supervisors, that he could have only occasional contact with his coworkers and the public, and that there would be frequent disruptions due to conflict if Loeckle "were required to work with coworkers." *Id.* Dr. Lassise also answered "yes" in response to a question asking whether Loeckle's ability to sustain

concentration in an eight-hour day was markedly limited, and when asked in follow-up the length of time Loeckle could maintain concentration, he wrote that it varied. *Id.* Dr. Lassise opined that Loeckle would require "intense supervision" a variable percent of the time. AR 716. Dr. Lassise found that Loeckle's error rate would equal or exceed 25%, that he would work at a slow pace a variable percent of time, that he would occasionally need unscheduled breaks, and that he would miss work a "variable" number of days per month due to anxiety and depression. *Id.*

The ALJ assigned Dr. Lassise's opinion some weight, finding the evidence supported that Loeckle "should be limited in his interactions with the public and only have easily learned jobs." AR 21. The ALJ declined to credit all of Dr. Lassise's opined limitations, however, finding that "a number of [Dr. Lassise's] answers in th[e] standardized form lack specificity and some of the answers are at odds with [Loeckle's] not insignificant work history." *Id*.

Loeckle argues that an ALJ may not "discount an [RFC opinion on a checkbox form] on the basis that the 'evaluation by box category' is deficient *ipso facto*." ***Reed v. Barnhart***, 399 F.3d 917, 921-22 (8th Cir. 2005). But an ALJ may "discount a treating physician's [checkbox form] where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning.'" ***Reed***, 399 F.3d at 921 (alteration in original) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 961 (8th Cir. 2001)). Here, the ALJ did not discount Dr. Lassise's opinion based solely on its form. Rather, the ALJ noted that some of Dr. Lassise's answers lacked specificity and some were inconsistent with Loeckle's work history.

Loeckle argues that Dr. Lassise's treatment records support his opined limitations and that Loeckle's mental health declined in the months leading up to his alleged onset date. I disagree. Loeckle points to a February 2016 treatment note from Dr. Lassise in

which he noted Loeckle's Global Assessment of Functioning (GAF) score was 44[5] and that Loeckle "continues to show mood lability and irritability with anxiety and social isolation." AR 520. Although Loeckle is correct that a GAF score in the 40s usually reflects serious mental-health symptoms, Dr. Lassise consistently evaluated Loeckle's GAF score between 41 and 45 from the time he began treating Loeckle in October 2014—during which time Loeckle retained the mental capability to work a full-time job weekdays and a part-time job weekends. *See* AR 455, 457, 463, 465, 467, 469, 471, 473, 477, 479, 481, 572, 576, 578, 582, 586, 590; *see also* AR 595, 611, 614, 617, 620, 623, 626, 630, 633, 636, 639, 642, 646 (PA Stowell routinely assigned Loeckle a GAF score between 60 and 70, reflecting more moderate mental-health symptoms). Similarly, Loeckle's reports of mood lability, irritability, and anxiety in February 2016 were nothing new; Dr. Lassise's treatment records routinely reflect similar complaints, resulting in Dr. Lassise frequently adjusting Loeckle's medications in an attempt to improve his symptoms. *See* AR 533, 538, 541, 546, 549, 564, 569, 572, 576, 578, 585. The treatment records do not reflect a decline in Loeckle's mental health, and despite his

---

[5] A GAF score is an examining clinician's score out of 100 assessing "an individual's social, occupational, and psychological functioning." *Mortensen v. Astrue*, No. CV 10-4976 (JRT/JJG), 2011 WL 7478305, at *2 n.4 (D. Minn. Sept. 30, 2011) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM) 32-33 (4th ed. 1994) (DSM-IV)), *report and recommendation adopted*, 2012 WL 811510 (Mar. 12, 2012).

> A GAF score of 40 to 50 . . . indicates a claimant suffers from severe symptoms. Specifically, a person with that GAF score suffers from "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

*Richardson v. Astrue*, No. 2:11-CV-02080, 2012 WL 1606102, at *4 (W.D. Ark. May 8, 2012) (alteration in original) (citations omitted) (quoting **DSM-IV** 34). The fifth edition of the DSM (DSM-V), published in 2013, abandons the GAF scale "because of its 'conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.'" *Bates v. Colvin*, No. 2:13 CV 99 DDN, 2014 WL 4439990, at *9 (E.D. Mo. Sept. 9, 2014) (quoting **DSM-V** 16).

symptoms, Loeckle was able to maintain full-time employment plus an additional part-time job during the time period covered by Dr. Lassise's treatment records.

Loeckle argues that the ALJ should have explained which of Dr. Lassise's limitations she found inconsistent with Loeckle's work history. But it appears the ALJ found all but Dr. Lassise's social-interaction limitations inconsistent with Loeckle's work history, which is supported by substantial evidence—the ALJ could find the need for intense supervision, frequent absences, unscheduled breaks, a slow-work pace, a high error rate, and marked limitations in sustaining concentration inconsistent with Loeckle's ability to maintain full-time employment in addition to working a part-time job weekends (in which he frequently worked alone (AR 363)).

Overall, the ALJ's discussion of the treatment records and other evidence, as well as the ALJ's reliance on Loeckle's work history, supports the ALJ's failure to fully adopt the limitations opined by Dr. Lassise. I recommend affirming the ALJ's decision to discount the medical opinions from Loeckle's treating sources.

### B. Inconsistency Between VE Hypothetical and Moderate Deficiencies at Step Three

Loeckle argues that the ALJ's hypothetical to the VE and corresponding RFC determination failed to account for limitations that the ALJ recognized at step three. When determining whether Loeckle's impairments met or equaled a listing for purposes of step three, the ALJ indicated that Loeckle was moderately limited in the category of understanding, remembering or applying information; moderately limited in the category of concentrating, persisting, or maintaining pace; and moderately limited in the category of interacting with others. AR 14-15. For purposes of steps four and five, the ALJ's VE hypothetical and RFC determination included only two mental-health limitations: Loeckle would be "limited to a job that could be learned in 30 days or less" and Loeckle "could have occasional contact with the public, co-workers, and supervisors." AR 16,

70-71.  Loeckle argues that these limitations do not reflect his moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace that the ALJ recognized at step three (Loeckle agrees that the RFC limitation to having occasional contact with supervisors, coworkers, and the public adequately accounts for the ALJ's step-three finding of moderate limitation in interacting with others).

Loeckle relies on the Eighth Circuit's decisions in *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), and *Scott v. Berryhill*, 855 F.3d 853 (8th Cir. 2017).  In *Newton*, the ALJ found that the claimant had borderline intellectual functioning and noted on a "Psychiatric Review Technique Form" attached to the decision that the claimant "'often' had deficiencies of concentration, or persistence or pace."  *Id.* at 691.[6]  The Eighth Circuit held that the hypothetical posed to the VE did not adequately capture those deficiencies with limitations to "simple jobs" and "an inability to perform highly skilled or technical work."  *Id.* at 694-95.  Thus, the Eighth Circuit held that the VE testimony did not support the ALJ's step-five finding.  *Id.*  The court noted that "[t]here [wa]s no

---

[6] "Often" suffering such limitations under the regulations in effect at the time of the *Newton* decision correlates to a finding of "moderate limitations" under the current regulations. *Compare* **20 C.F.R. §§ 404.1520a(b)-(d), 416.920a(b)-(d)** (1996) *and* **20 C.F.R. 404, Subpt. P., App. 1, § 12.00** (1996) (ALJ rated claimant's limitations in concentration, persistence, or pace for purposes of step three using five-point scale of "[n]ever, seldom, often, frequent, [or] constant"; and claimant met "paragraph B" criteria for most mental-health listings if the claimant suffered "frequent" limitations in concentration, persistence, or pace in addition to a marked limitation in another category), *with* **20 C.F.R. 404, Subpt. P., App. 1, § 12.00** (2018) (ALJ rates claimant's limitations in concentration, persistence, or pace for purposes of step three using five-point scale of "none, mild, moderate, marked, or extreme"; and claimant meets "paragraph B" criteria for mental-health listings if the claimant suffers at least two "marked" limitations); *see also* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, **65 Fed. Reg. 50746**, 50753 (Aug. 21, 2000) (noting that the seldom-often-frequent-etc. scale for "difficulties in maintaining concentration, persistence, or pace" was changed to the mild-moderate-marked-etc. scale "to parallel" the scales for the social-functioning and understanding-information categories).

(Footnote continued . . .

15

dispute in the medical evidence that [the claimant] suffer[ed] from deficiencies of concentration, persistence, or pace" and that the VE testified a "moderate deficiency in the[] areas [of concentration and persistence] would cause problems on an ongoing daily basis, 'regardless of . . . what the job required from a physical or skill standpoint." *Id.* at 695.

In *Scott*, the Eighth Circuit recognized that under *Newton*, "[a] hypothetical question that omits the effects of concentration, persistence, or pace deficiencies that the ALJ has found is not sufficient." 855 F.3d at 857.[7] But the court noted that "a sufficient hypothetical need not contain much more than the hypothetical at issue in *Newton*." *Id.* In *Scott*, the ALJ found at step three that the claimant suffered moderate limitations in concentration, persistence, or pace. *Id.* at 855. The Eighth Circuit held that the VE hypothetical "adequately captured the concrete consequences of [the claimant's] deficiencies" by limiting the claimant to unskilled work involving little independent judgment, "jobs with few variables," tasks that can be "learned and performed by rote," and supervision that is simple, direct, concrete, and brief. *Id.* at 855, 858. The court noted that the ALJ's discussion of the claimant's concentration, persistence, or pace

[7] The Commissioner suggests that the definition of "moderate limitation" in the regulations, which was not in effect at the time of the ALJ's decision in *Scott*, supports that moderate limitations need not be reflected in the RFC. The definition provides that a claimant suffers moderate limitations when his "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." **20 C.F.R. 404, Subpt. P., App. 1, § 12.00(F)(2)(c)**; *see also* Revised Medical Criteria for Evaluating Mental Disorders, **81 Fed. Reg. 66138** (Sept. 26, 2016). The Commissioner argues that this definition demonstrates that if a person suffers moderate limitation, they have no deficiency. *See* Doc. 13 at 13. I disagree—by definition, a person with no deficiency would be rated at "no limitation." **20 C.F.R. 404, Subpt. P., App. 1, § 12.00(F)(2)(a).** In addition, the Social Security Administration recognized when adopting the definitions that a person with "moderate" limitations in three categories (and no marked or extreme limitations) may be disabled; but that whether the person was disabled should be decided at steps four and five, rather than at step three based on the listings. *See* **81 Fed. Reg. at 66146-47** (also noting "the spectrum of limitation that may constitute 'moderate' limitation ranges from limitations that may be close to 'marked' in severity to limitations that may be close to the 'mild' level).

deficiencies demonstrated "the lack of severity" of those deficiencies and that therefore, the limitations in the VE hypothetical "sufficiently captured the concrete consequences of [the claimant's] deficiencies." *Id.* at 858.

Here, the ALJ's VE hypothetical and RFC limited Loeckle "to a job that could be learned in 30 days or less." The amount of time it takes the typical worker to learn a job is called the specific vocational preparation (SVP) level, and the Dictionary of Occupational Titles (DOT) lists each job's SVP level. **DOT, App. C**. Jobs with an SVP level of 1 require a "short demonstration only," while jobs with an SVP level of 2 involve more than a "short demonstration up to and including 1 month." *Id.* Thus, by limiting Loeckle to a job that could be learned in thirty days or less, the ALJ limited Loeckle to jobs with an SVP level of one or two. The parties agree that work with an SVP level of one or two constitutes "unskilled work." Doc. 12 at 10; Doc. 13 at 13 n.9; *see also Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010); **Social Security Ruling (SSR) 00-4P**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000).

Loeckle argues that the ALJ's RFC limitation to a job that can be learned in thirty days or less—unskilled work—fails to account for his moderate limitations in concentration, persistence, or pace. Loeckle argues that *Newton* is directly on point. I disagree. *Newton* involved an RFC limitation restricting the claimant's ability "to perform highly skilled or technical work," which could allow for the claimant to perform all but the highest levels of skilled work (such as semi-skilled work)—as long as the work involved simple tasks, an additional limitation. The limitation to unskilled work here is more restrictive than the skill limitation found insufficient in *Newton*.

Although a limitation to "simple jobs" does not sufficiently account for a moderate limitation in concentration, persistence, or pace (as the Eighth Circuit held in *Newton*), a limitation to jobs involving "simple, repetitive, routine" tasks does. ***Howard v. Massanari***, 255 F.3d 577, 582 (8th Cir. 2001). By definition, unskilled work involves "simple duties that can be learned on the job in a short period of time" and requires "little

17

or no judgment." **20 C.F.R. §§ 404.1568(a), 416.968(a)**. Guidance from the Social
Security Administration further provides that "[t]he basic mental demands of . . .
unskilled work include the abilities (on a sustained basis) to understand, carry out, and
remember simple instructions; to respond appropriately to supervision, coworkers, and
usual work situations; and to deal with changes in a routine work setting." **SSR 85-15**,
1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857, at *4 (Jan. 1, 1985). Considering
these descriptions of unskilled work, a limitation to unskilled work appears more akin to
the limitation to "simple, repetitive, routine" tasks upheld in *Howard* than the limitation
to "simple work" that is not "highly skilled or technical" struck down in *Newton*. I
recommend finding that the ALJ's step-three findings of moderate limitations in
concentration, persistence, or pace and moderate limitations in understanding,
remembering, or applying information are not inconsistent with the ALJ's RFC
determination limiting Loeckle to unskilled work. *See Koenig v. Berryhill*, No. 4:16-
cv-00556-NKL, 2017 WL 838092, at *7 (W.D. Mo. Mar. 3, 2017) ("An ALJ may
account for deficiencies in concentration, persistence, or pace by limiting a claimant to
jobs at a particular SVP level." (citing *Vigil v. Colvin*, 805 F.3d 1199, 1203 (10th Cir.
2015) ("The ALJ found at step three that Vigil has moderate difficulties in concentration,
persistence, and pace . . . . The ALJ took these difficulties into account in formulating
[the] RFC by limiting the skill level of his work with an SVP one or two.")); *Hosch v.
Colvin*, No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016)
("[M]oderate limitations in concentration, persistence, or pace are consistent with the
simple, routine, repetitive tasks involved in unskilled work."); *but see Wilson v.
Berryhill*, No. 4:18-CV-00446-JM-JTK, 2019 WL 449207, at *2 (E.D. Ark. Feb. 5,
2019) (holding that RFC limitation to unskilled work did not account for step-three
finding of moderate limitation in concentration, persistence, or pace), *report and
recommendation adopted,* 2019 WL 845409 (Feb. 21, 2019); *Rojas v. Colvin*, No. 4:15-
CV-00004-ODS-SSA, 2015 WL 9901286, at *2 (W.D. Mo. Jan. 13, 2015) (same)

This conclusion is bolstered by the evidence of record in this case, which does not support greater mental limitations than those found by the ALJ. The ALJ noted that objective examinations of Loeckle's mental status were mostly normal, including normal insight, "fund of knowledge," concentration, judgment, and memory. AR 17-18, 581, 585, 594, 610, 613, 616, 619, 622-23, 625, 629, 632, 635, 638, 645. The ALJ also noted function reports from Loeckle and his girlfriend suggest that he has greater difficulties following oral instructions than written instructions and that he could follow simple, written instructions. AR 17, 298, 308. Finally, the ALJ pointed to Loeckle's activities of daily living, including that he was able to maintain full-time employment despite his mental impairments prior to the relevant time period (and as noted, treatment records do not reflect a deterioration in Loeckle's mental health). AR 17-18.

I recommend finding that the ALJ did not err by failing to include in the VE hypothetical or RFC determination additional limitations in concentration, persistence, or pace, or in understanding, remembering, or applying information based on the ALJ's step-three findings.

### C. ALJ's Failure to Adopt All of the State Agency Psychological Consultants' Limitations

Loeckle argues that the ALJ erred by failing to adopt RFC limitations included in the state agency psychological consultants' RFC opinions, or by otherwise failing to explain why the ALJ found Loeckle less limited than the state agency psychological consultants. Nonexamining state agency psychological consultant Vincent Marziano, PhD, evaluated Loeckle's mental RFC in May 2016. AR 85-87. Dr. Marziano found Loeckle suffered moderate limitations in the following areas: ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent

pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; and ability to respond appropriately to changes in the work setting. AR 85-86. Dr. Marziano concluded:

> Despite his mental health condition, [Loeckle] is able to follow 3–4 step commands in a sustained manner. At times, [Loeckle] will have difficulties following detailed instructions, sustaining extended attention/concentration, maintaining pace, and handling change. Similarly, his variable mood will impact his interactions with others; he will likely perform best in a routine environment with limited interactions to the public.

In October 2016, nonexamining state agency psychological consultant Scott Shafer, PhD, affirmed Dr. Marziano's assessment. AR 120-23.

The ALJ assigned Dr. Marziano's and Dr. Shafer's opinions "significant weight," finding them "well supported and consistent with other evidence." AR 21. The ALJ noted that Dr. Marziano's and Dr. Shafer's opinions supported the ALJ's mental RFC limitations "that the claimant should be limited to positions that can be learned in 30 days or less with only occasional interaction with others." *Id.*

Loeckle argues that by finding he would "have difficulties following detailed instructions" at times, the state agency consultants limited him to work with a reasoning level of one, which is more limiting than the ALJ's RFC determination. The DOT assigns each job a "reasoning level" (the way it assigns each job an SVP level), which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance" and are ordinarily "obtained in elementary school, high school, or college," but "may be obtained from experience and self-study." **DOT, App. C.** Jobs with reasoning levels one through three require a claimant to:

- LEVEL 1 - Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

- LEVEL 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

- LEVEL 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

*Id.* Although Drs. Marziano and Shafer found that Loeckle would have difficulties following detailed instructions at times, they ultimately concluded that he could "follow 3-4 step commands in a sustained manner." AR 85-86, 123. Thus, they found Loeckle able to perform more difficult work than reasoning level one work, which involves only "one- or two-step instructions." *Cf. Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) (holding that RFC limitation to "carrying out simple job instructions" was not inconsistent with performing jobs with "detailed but uninvolved" instructions as required for reasoning level two work).[8]

I disagree with Loeckle that the state agency consultants' opinions support that he is limited to jobs with a reasoning level of one. But I agree that a limitation to work with no more than three- and four-step tasks (as found by the state agency consultants) is inconsistent with the ability to work reasoning level three jobs. Loeckle notes that the ALJ's RFC did not limit his reasoning level, only his SVP level, and two of the jobs the

---

[8] Loeckle suggests in passing that the ALJ's findings at step three support that the ALJ found him limited to reasoning level one work. When addressing Loeckle's limitations in understanding, remembering, or applying information at step three, the ALJ noted that function reports from Loeckle and his girlfriend reflect that he had difficulties following oral instructions (but not written instructions), and the ALJ concluded that "[t]he evidence demonstrates the claimant can . . . follow one or two-step *oral* instructions to carry out a task." AR 14 (emphasis added). The ALJ did not find Loeckle's ability to follow *written* instructions limited to one or two-step instructions. The ALJ's step-three findings do not support that the ALJ found Loeckle limited to reasoning level one work. I do not address whether the ALJ should have limited Loeckle's ability to follow oral instructions in his RFC distinct from his ability to follow written instructions based on the ALJ's step-three finding, as Loeckle did not sufficiently raise this argument, and thus, it has been forfeited.

21

ALJ found Loeckle could perform at step five require a reasoning level of three (document preparer, DOT § 249.587-018; and weight tester, DOT § 539.485-010).

Loeckle argues that the ALJ's VE hypothetical and RFC determination should have included a reasoning-level limitation or otherwise explained the ALJ's failure to include that limitation, despite assigning the state agency consultants' opinions great weight. Loeckle cites *Gann v. Berryhill*, 864 F.3d 947 (8th Cir. 2017). In that case, the ALJ assigned significant weight to the opinions of the state agency consultants but did not include their adaptive limitations in the VE hypothetical. *Id.* at 952-53. Because of this, the Eighth Circuit held that the VE's testimony did not support the ALJ's step-five finding. *Id.* at 953. Relying on *Gann*, Judge Strand has held that when the only medical opinions in the record are from state agency consultants, and the ALJ assigns those opinions "great weight" and notes they are "consistent with the record as a whole," the ALJ errs by failing to adopt a limitation found by the state agency consultants or by otherwise failing to explain the omission. *See **Block v. Saul***, No. C18-118-LTS, 2020 WL 1505566, at *6-7 (N.D. Iowa Mar. 30, 2020) (discussing ***Burns v. Saul***, No. 18-cv-72-LTS (N.D. Iowa Jan. 10, 2020)).[9]

---

[9] Several other district courts in the Eighth Circuit have found error when the ALJ purportedly gives "great weight" to the opinion of a state agency consultant but fails to adopt some of the limitations contained in that opinion without explanation. *See **McCaskill v. Berryhill***, No. 4:17-CV-04121-KES, 2018 WL 2144553, at *19-21 (D.S.D. Apr. 20, 2018) (recommending holding that substantial evidence did not support the ALJ's RFC determination when the ALJ gave "great weight" to the state agency consultant's RFC opinion but failed to include many limitations imposed by that opinion, thus neglecting to "explain *what portions* of [the opinion] are rejected and *why*"), *report and recommendation adopted*, 2018 WL 2138659 (May 9, 2018); ***Webster v. Astrue***, 628 F. Supp. 2d 1073, 1090-92 (D. Neb. 2009) (holding that remand was required when the ALJ purportedly "agree[d] with the detailed analysis" of the state agency consultants but failed to include in the RFC many of the moderate limitations found by the state agency consultants, which the vocational expert testified in combination would prohibit sustained work); *see also **Sanders v. Astrue***, No. CIV. 11-1356 (JNE/JJG), 2012 WL 1657922, at *12-13 (D. Minn. Apr. 17, 2012) (recommending holding that when the ALJ "professed to place significant weight on" the state agency psychological consultant's opinion but did not restrict the claimant

(Footnote continued . . .

22

Judge Strand distinguished *Gann*, however, in *Block v. Saul*. In that case, the ALJ found that the claimant did not suffer severe mental impairments at step two, which was supported by the medical opinions from the state agency consultants. *Id.* at *4-5. Relying on *Gann*, the claimant argued that the consultative examiner's opinion, which the ALJ had assigned "great weight," supported greater mental limitations than those found by the ALJ. *Id.* at *6. The court affirmed the ALJ's decision, finding that the vague nature of the consultative examiner's opined limitations was insufficient evidence on its own to establish the claimant suffered from a severe mental impairment. *Id.* at *4-5. The court distinguished *Gann*, noting that the consultative examiner's opinion was not the only medical opinion in the record and that the ALJ "adequately articulated reasons" for excluding from the RFC any additional limitations supported by the consultative examiner's opinion. *Id.* at *7.

The facts here are more similar to *Gann* and *Burns* than to *Block*. The ALJ assigned the state agency consultants' opinions great weight, but nothing in the ALJ's opinion explains the ALJ's failure to include a reasoning-level limitation, as supported by their opinions. The only other medical opinion in the record addressing Loeckle's mental limitations (from Dr. Lassise) found Loeckle more limited than the state agency psychological consultants. I recommend finding that the ALJ erred by failing to limit Loeckle to reasoning-level-two positions, as supported by Dr. Marziano's and Dr. Shafer's opinions, or by otherwise failing to explain the failure to adopt this limitation.

Nevertheless, I recommend finding that this error was harmless. The VE identified three jobs that Loeckle could perform—document preparer, weight tester, and

_____

to "brief" and "superficial" interaction with others, as the state agency consultant had, "[t]he case should be remanded so that the ALJ can incorporate [additional limitation] or explain why he rejected these limitations"), *rejecting report and recommendation in relevant part*, 2012 WL 1658988 (May 11, 2012) (holding that remand was not required because substantial evidence otherwise supported "the ALJ's decision regarding [the claimant's] recommended interaction with coworkers," and because the work the ALJ found the claimant could perform did not seem to require more than brief and superficial contact with coworkers).

addresser. As noted, the document preparer and weight tester positions require a reasoning level of three. But the addresser position only requires a reasoning level of two. **DOT § 209.587-010**. Thus, even accepting Loeckle's argument that the ALJ erred in failing to limit his reasoning level in the hypothetical to the VE (and correspondingly, in the RFC) based on the opinions of the state agency psychological consultants, one job remains that he could perform, even if the ALJ had included the requested limitation. The VE testified, and the ALJ found, that 85,000 addresser positions existed in the national economy. AR 23, 71. The Eighth Circuit has held on harmless-error review that this number of positions in the national economy constitutes substantial evidence supporting the ALJ's step-five determination. *See Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (32,000 jobs); *see also Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009-10 (11th Cir. 2020) (finding any error harmless when two jobs remained that the claimant could perform and totaled 78,000 positions in the national economy, which the court held was "substantial evidence to support the ALJ's finding on step five").

Accordingly, although I recommend finding that the ALJ erred in failing to limit Loeckle to positions with a reasoning level of two, I recommend finding that any error was harmless.

### D. Appointments Clause Challenge

Loeckle argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution. The Eighth Circuit recently ruled that a Social Security claimant forfeits an Appointments Clause challenge by failing to raise it before the Social Security Administration. *Davis v. Saul*, No. 18-3422, 2020 WL 3479626 (8th Cir. June 26, 2020). Because Loeckle did not challenge the constitutionality of the ALJ's appointment at any point during the administrative

proceedings, I recommend finding that Loeckle forfeited his Appointments Clause challenge.

### III.   CONCLUSION

I respectfully recommend that the district court affirm the ALJ's decision and enter judgment in favor of the Commissioner.

**ENTERED** this 11th day of August, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa